IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| TDE of Illinois, Inc., | ) | 18 B 19211 |
| | ) | Chicago, Illinois |
| | ) | 9:00 a.m. |
| Debtor. | ) | July 19, 2018 |

TRANSCRIPT OF PROCEEDINGS BEFORE THE
HONORABLE JANET S. BAER

APPEARANCES:

For the Debtor:            Mr. Jeffrey Paulsen;
                          Mr. Thomas M. Britt;

For PNC Bank:             Mr. Martin Wasserman;

For the U.S. Trustee:     Ms. Katy Gleason;

Court Reporter:           Jerri Estelle, CSR, RPR
                          U.S. Courthouse
                          219 South Dearborn
                          Room 661
                          Chicago, IL  60604.

2

```
 1                    THE CLERK:  Taking up this court's
 2   9:00 o'clock matters, TDE of Illinois, Inc.
 3                 (Discussion between the Court
 4                  and the courtroom deputy.)
 5                    THE COURT:  Wow, it's never hot in
 6   here.  So today we have a trial, and it's hot, okay.
 7                    Appearances.
 8                    MR. BRITT:  Thomas M. Britt on behalf
 9   of TDE of Illinois, Inc., the debtor.
10                    MR. ANTHONY:  William Anthony,
11   president of TDE of Illinois.
12                    THE COURT:  Good morning, Mr. Anthony.
13                    MR. PAULSEN:  Jeffrey Paulsen for TDE.
14                    MR. WASSERMAN:  Martin Wasserman on
15   behalf of PNC.
16                    MS. GLEASON:  Katy Gleason on behalf
17   of the United States Trustee.
18                    THE COURT:  Mr. Paulsen, where did you
19   come from?
20                    MS. GLEASON:  Yeah.
21                    MR. PAULSEN:  I filed my appearance
22   this morning, Your Honor.  We are stepping in to be
23   co-counsel with Mr. Britt for this case.
24                    THE COURT:  Okay.  Thank you.
25                    All right.  We are here on
```

3

1   Mr. Britt's –– on TDE's request for the interim use

2   of cash collateral.  There have been objections.

3   Before we start the trial, has anything happened

4   since we were last here?

5                    MR. PAULSEN:  Your Honor, we don't

6   have an agreed order, if that's what you're asking.

7                    THE COURT:  That's a start.

8                    MR. PAULSEN:  We did speak with PNC

9   yesterday.  I understand they have some of the same

10  concerns that you had raised at the last hearing.

11                   So, we're ready to proceed with some

12  testimony from Mr. Anthony to explain the business,

13  and how we got here, and where we're going going

14  forward.

15                   THE COURT:  Good.  That's exactly what

16  I'm looking for.

17                   And just –– Mr. Paulsen, since you

18  weren't here the other day, just so I can kind of

19  summarize –– and I note that PNC filed a motion for

20  relief from the automatic stay this morning, or was

21  it last night?  Yeah.

22                   MR. WASSERMAN:  And, Your Honor, we

23  did that for two reasons.  We thought under Strumpf

24  v. Maryland, because we put an automatic hold on the

25  accounts, we were required to file that motion.  We

1  are again not -- we're in the same position that we

2  were on Monday, where we're not opposed to this

3  bankruptcy as a whole.  We could move away from that

4  motion.  We could move away from our objection to

5  cash collateral, but we're still a little perplexed

6  on how we got here and where we stand.

7            THE COURT:  Yeah.  And actually the

8  reason I mentioned is because it was a little helpful

9  in filling in some of the blanks.

10            And, Mr. Paulsen, here's my concern.

11 It looks like we've got a company that was running

12 with a couple of term notes from PNC, and a line of

13 credit all of a sudden was executed with PNC in

14 January of 2018 for $350,000.  I don't know what was

15 there beforehand, but all of a sudden, obviously,

16 something changed.

17            Then, much more dramatically, it looks

18 like a couple months later, several short-term,

19 extremely high-interest loans were taken out by the

20 company, far exceeding any of the monies that were

21 owed to PNC.  And then about a month after that, it

22 looks like confessions of judgment of some sort were

23 done in New York.  And there are judgments.  And all

24 of a sudden we've got a company that seemed to be

25 going along at a much smaller rate of money needed,

1  that's got these giant obligations that immediately

2  were taken out and immediately went into default.

3  And I want to know what happened and why.

4           My concern is we have to watch out for

5  all the creditors here.  There's no creditor's

6  committee.  And thank goodness Ms. Gleason is here

7  too.  We've got to make sure that operating this

8  company is in anybody's best interest because right

9  now it sounds like it's a giant loser.  So that's

10  where we're at.

11          MR. PAULSEN:  I understand, Your

12  Honor.  And I guess in a way -- somewhat in the way

13  of an opening statement, what Mr. Anthony will tell

14  you today, he's going to talk a little bit about the

15  company and where it came from.

16          For a long time, it's biggest customer

17  was a company called Transtar.  Transtar, the

18  relationship changed at some point.  And we'll get

19  into dates and stuff with Mr. Anthony.  But they

20  ended up doing some sort of audit and a claim that

21  TDE owed money to Transtar, so they started taking

22  money out of the invoices that they were supposed to

23  pay.

24          On top of that, they changed the type

25  of items that they were ordering, which were much

1  more expensive for TDE to produce.  They had to buy

2  different equipment and different inputs in order to

3  produce the outputs for Transtar.  Transtar

4  apparently had too much inventory themselves, so they

5  reduced the orders from TDE.  And then the icing on

6  the cake is they just didn't pay their invoices.

7            So when we look at the financial

8  reports from March, April, May, and June, what you'll

9  see is that the -- you'll see -- on an accrual basis,

10  you'll see there's supposed to be net income coming

11  in, but because they're not being paid by Transtar,

12  they had to turn to these high-interest loans in

13  order to kind of plug the gap.

14            And then in the meantime, they were

15  also trying to sell the company.  So they were

16  hopeful that they would be able to sell the company

17  to one of their customers, I believe.  And for

18  whatever reason, that didn't come to fruition and it

19  took longer then they had hoped.  So, again, they had

20  turned to these high-interest loans to try to plug

21  that hole and keep things going until they could kind

22  of get out of the situation.  Eventually, things got

23  to a critical point.  Some of these high-interest

24  loans were going to get paid.  They went out and got

25  confessions of judgment, and now we're here today.

1          Some developments over the past couple

2   of weeks.  I believe on Monday, Mr. Britt had let you

3   know that Mr. Anthony was meeting with a new client.

4   That new client has come through.  Mr. Anthony will

5   tell you about that.  Also, I believe last night he

6   got another new client, and several other people have

7   been contacting him and placing orders as well.

8          So, at the end of the day, you know,

9   this was a business that had a crisis, and things are

10  stabilizing now.  And, you know, we're in bankruptcy

11  to get that breathing room to enable us to kind of

12  get back on our feet and move forward.

13         We have a budget today that we've

14  taken a look at it; we've gone through.  We're going

15  to have a $14,000 net income between now and

16  July 31st.  And, hopefully, we'll be back, you know,

17  either on the 30th or 31st, and show you a better

18  budget for the next month moving forward.

19              THE COURT:  Okay.  Good.

20         I believe the burden is on you,

21  Mr. Paulsen, so you may proceed.

22         Would you like to make some sort of an

23  opening statement?

24              MR. WASSERMAN:  You know, I don't have

25  an opening statement as much as counsel handed me a

8

1   new budget this morning, and I'm not sure that -- I'm

2   pretty sure the court has not seen it --

3              MS. GLEASON:  No, I have not seen --

4              MR. WASSERMAN:  -- nor the U.S.

5   Trustee.  Before we got started, it might be helpful

6   to pass that around.

7              THE COURT:  Okay.

8              MR. PAULSEN:  Yes, I'm happy to do

9   that, Your Honor.

10              THE COURT:  Good.

11              MR. PAULSEN:  May I?

12              THE COURT:  Yes.

13              MR. PAULSEN:  I have two copies there.

14   One for you and one for your clerk.

15              THE COURT:  All right.  Thank you.

16              MR. PAULSEN:  All right.

17              THE COURT:  Okay.

18              MR. PAULSEN:  And if you're ready,

19   Your Honor, we'd like to call Mr. Anthony.

20              THE COURT:  Yes.

21              Mr. Anthony, if you could come over

22   here.

23              The rest of you can have a seat.

24              And raise your right hand.

25                  (Witness sworn.)

9

1            THE CLERK:  Please state your name and

2    spell it for the record.

3            THE WITNESS:  William L. Anthony.

4    W-I-L-L-I-A-M, middle initial L, A-N-T-H-O-N-Y.

5            THE COURT:  Mr. Anthony, you can have

6    a seat.  The court reporter will be taking down every

7    word you say, so if you can just make sure you answer

8    audibly.

9            THE WITNESS:  Yes.

10           THE COURT:  And it's a little awkward

11   because her back's kind of to you, so keep your voice

12   up.

13           THE WITNESS:  Yes.

14       WILLIAM L. ANTHONY, WITNESS, SWORN

15             DIRECT EXAMINATION

16   BY MR. PAULSEN:

17       Q    Good morning, Mr. Anthony.  Could you

18   please tell me your relationship to TDE of Illinois.

19       A    I am the president of the company, and the

20   original person that started the company.

21       Q    And when did you start the company?

22       A    In 2006.

23       Q    All right.  What does TDE do?

24       A    We are an automotive and light truck

25   transmission remanufacturer that sells to customers

10

1   on a global scale.

2       Q    Now when you say remanufacturer, what does

3   that mean?

4       A    We take old transmissions that are found in

5   wrecking yards that we purchase.  We remanufacture

6   them back to factory specifications or better.  We

7   then dyno test them on a specialized piece of

8   equipment and ship them all over the world.

9       Q    Okay.  Where do you acquire these

10  transmissions?

11      A    From wrecking yards.

12      Q    Okay.

13      A    Core suppliers.  We search nationwide for

14  our product.

15      Q    And who do you sell these transmissions to?

16      A    Well, Transtar had become our largest

17  client over the last few years.  We sell to AAMCO

18  Transmissions, Mr. Transmissions, King-O-Matic of

19  Canada, which is a division of Transtar, but

20  separate.  We just got a new customer last night,

21  ITW, which is Idaho Transmission Warehouse.  We sell

22  to general repair shops nationwide.

23      Q    Do you sell direct to consumers?

24      A    No, we do not.

25      Q    You mentioned Transtar.  Who are they?

1        A        Transtar is the number one company in our

2    industry.   They are a $500 million a year operation.

3        Q        And for a scale, what is your annual gross

4    revenue?

5        A        We topped out just over 6.5 million.

6        Q        That was for 2017?

7        A        I don't know for 2017.  I have not seen the

8    tax return yet.

9        Q        Okay.  So, that was --

10       A        That was 2016, I know we did.

11       Q        Okay.  And so Transtar purchases

12   remanufactured transmissions from you?

13       A        Correct.  And then they turn around and

14   resell our product to all of their customers.

15       Q        Okay.  Do they also sell you inputs?

16       A        They sell us product that we use in the

17   process of remanufacturing transmissions, yes.

18       Q        What kinds of product?

19       A        Overhaul kits, bushings, filters,

20   solenoids, everything inside of a transmission.

21       Q        And how long have you been -- how long have

22   you -- has Transtar been a customer of yours?

23       A        2010.

24       Q        Okay.  Have -- and what percentage of your

25   business do they represent?

1     A     At one point they were less than ten

2  percent.  Now they equate to about 80 percent of our

3  business.

4     Q     Okay.  Now, did Transtar file for

5  bankruptcy?

6     A     Yes.

7     Q     And how did that affect your business?

8     A     At one point Transtar owed us over a

9  million-and-a-half dollars.

10    Q     Do you recall when they filed for

11 bankruptcy?

12    A     The president of the company came out to

13 see me, and with the CEO, it was late 2016.

14    Q     Okay.  And that one-and-a-half million --

15 one-and-a-half million dollars?

16    A     Yeah, that was the -- that was the highest

17 number they ever got with us for owing us.

18    Q     And did they eventually pay that down?

19    A     Yes.

20    Q     Over what time period?

21    A     Over a year.

22    Q     At some point did they do some sort of

23 audit of their relationship with you?

24    A     Yes.  We were told that the bankruptcy

25 court, we were named one of their top -- out of 400

1  vendors, we were named as their top -- one of their

2  top 40 that were required for them to move forward.

3      Q    Okay.

4      A    So they did -- they told us they did an

5  audit.  And due to errors on both parts of the

6  industry, meaning Transtar and us, they came back and

7  said we owed them $1.4 million.

8      Q    Transtar said that?

9      A    Yes.

10      Q    Against the 1.5 that they owed you?

11      A    Yes.

12      Q    Okay.  And what happened after that?

13      A    We protested with them.  We asked for

14  documentation.  We never got anything from them other

15  than being told, suck it up, this is what it costs to

16  do business with Transtar.  We entered into an

17  agreement because they had become our biggest client.

18  Either we accepted the terms or they stopped doing

19  business with us.  And we entered into an agreement

20  of payment of $20,000 a week to be subtracted from

21  their ACH payment to us.

22      Q    Do you recall when you entered into that

23  agreement?

24      A    August of 2017.

25            May I also add something about that

1   agreement?

2        Q     Yes.

3        A     They were in the process of closing down

4   some of their own facilities.  We were promised more

5   work in order to offset that $20,000 payment as well.

6        Q     Did they give you more work?

7        A     Not to offset what they said they would.

8        Q     All right.

9        A     We wound up having to spend more money to

10  do what they wanted us to do, and it never beared

11  fruit to where they said it would.

12       Q     Okay.  So, the $20,000 a week, they started

13  taking off the invoices that they were supposed to

14  pay you, correct?

15       A     Right.  We would ship them a hundred

16  thousand dollars of product in a week, let's say.

17  When the ACH payment came in, they would have

18  deducted $20,000.

19       Q     Now you mentioned for a second there the

20  types of items that they were ordering from you.

21       A     Um-hum.

22       Q     Did that change at some point?

23       A     Dramatically.  We got an e-mail, I don't

24  remember the exact month this year, they were

25  consolidating.  They had 67 facilities nationwide.

1   They were consolidating all product into 11

2   facilities.  And they realized they were $36 million

3   overstocked, so they were going to stop ordering

4   product until they whittled down their inventory.

5        Q    And did they reduce the amount of product

6   they ordered?

7        A    Yes, drastically.

8        Q    What percentage would you say?

9        A    About 90 percent less.

10        Q    And then for the products that they did

11   order, were these different than what you had

12   previously produced for them?

13        A    Yes.

14        Q    How was that?

15        A    We had started the company as a German

16   specialist.  Mercedes, BMW, Land Rover, Jaguar, Audi,

17   Volkswagen, that's what we did.  We were a supplier

18   to CarMax.  We were very well known for doing these

19   units.

20             With Transtar we wound up doing a

21   broader rage of domestic product.  And we had to

22   spend a phenomenal amount of money to go buy this

23   product, to reman it, to sell it to them, okay, in

24   order to keep them happy, because that's the way it

25   worked with them.

1      Q      So, with Transtar, they were taking money

2   out of the invoices that you issued them every week?

3      A      Yes.

4      Q      They reduced the type -- the orders that

5   they were making for you?

6      A      Yes.

7      Q      They changed the type of orders that they

8   were making to a more expensive product?

9      A      No, less expensive.

10      Q      Less expensive.

11      A      Yes.

12      Q      But you had to purchase more -- different

13   inputs for them?

14      A      Correct.

15      Q      And then when it came time to pay the

16   invoices, did they pay?

17      A      No.

18      Q      When is the last time you got a payment

19   from Transtar?

20      A      Over a month.  And that was only after

21   being strong-armed about a warranty labor payment.

22      Q      How much do you think Transtar -- or how

23   much do you believe that Transtar owes you at this

24   point?

25      A      Well, per their last e-mail, which was two

1  weeks ago, I think it was -- they owed us about

2  $180,000, per their own e-mail.  And that was before

3  we even went through and audited and verified their

4  numbers because they never got it right the first

5  time.

6       Q    So with your biggest customer kind of

7  changing this relationship with you, were you able to

8  continue operating as normal?

9       A    No.

10       Q    What happened?

11       A    I had to let half the staff go.  We started

12  immediately when I saw what was happening with them.

13  I started looking for new clients.  I went directly

14  to one of their number one competitors.  I have a

15  meeting scheduled with them tomorrow to talk about

16  offering them product.

17                 We acquired another new client up in

18  Wisconsin that wants to buy quite a bit of product

19  from us, and we do production building for them.

20  Excuse me.  We started going more direct and looking

21  for places to sell our product.

22       Q    Did you have any months that were

23  particularly bad for the past few months?

24       A    Oh, yes.  Yeah.

25       Q    Which ones?

18

1    A    May was especially brutal.  I know April --

2  I believe April was down.  You have to excuse me,

3  I've been in and out of the hospital quite a bit

4  since March, so I have not been keeping up with daily

5  operations.  But, yes, May was especially brutal for

6  us.

7              MR. PAULSEN:  Your Honor, may I

8  approach the witness?

9              THE COURT:  Yes, you may.

10              THE WITNESS:  Yes, March was down.

11  BY MR. PAULSEN:

12    Q    Sir, can you identify the document that I

13  just handed to you?

14              THE COURT:  Mr. Paulsen --

15              THE WITNESS:  Yes, profit and loss for

16  TDE of Illinois, March, 2018.

17              MR. PAULSEN:  I'll mark this as

18  Exhibit A.

19              THE COURT:  Okay.

20  BY MR. PAULSEN:

21    Q    Do you recognize this document?

22    A    Yes.

23    Q    This document was -- where does this

24  document come from?

25    A    This document comes out of our QuickBooks

19

1   system that we have at our facility.

2       Q    And are the QuickBooks maintained in the

3   regular course of your business?

4       A    Yes.  It's done by our bookkeeper.

5       Q    Have you -- and you've seen this document

6   before, correct?

7       A    Yes.

8           MR. PAULSEN:  Your Honor, I'd like to

9   admit Exhibit A into evidence.

10          THE COURT:  Any objection?

11          MR. WASSERMAN:  No objection.

12          THE COURT:  Okay.  It will be

13  admitted.

14  BY MR. PAULSEN:

15      Q    Can you walk us through this document, and

16  can you tell us what it shows?

17      A    Well, the document starts out with our

18  transmission sales for the month at $331,000.  It

19  shows we sell product, as we stated, to various

20  independent companies.  So you'll see transferred

21  case sales, valve body sales, and actually liftgate

22  fees for our shipping department.

23              In-shop parts means stuff that --

24  product that we sold to various local transmission

25  companies that come to us for a product.  Labor is

1  our in-house repair facility, part sales.

2              And, I mean, it shows everything about

3  us financially.  And it shows that at that time we

4  were very profitable.

5      Q    So in March you had $387,000 in gross

6  income, correct?

7      A    Correct.

8      Q    And then below that, can you tell us -- you

9  don't have to go into every line item, but can you

10 tell us a little bit about the different -- other

11 sections of this report?

12     A    Well, it shows our loans, credit card

13 processing, insurance -- excuse me, our payments to

14 PNC, OnDeck, who is a company that we borrowed money

15 from when we needed to grow again; security, which is

16 the alarm system; the uniform rental; building rent;

17 electric, everything; computer software.  And it gets

18 all the way down to the bottom line where our net

19 income was up $164,578.11.

20              MR. PAULSEN:  Your Honor, may I

21 approach the witness?

22              THE COURT:  You may.

23              THE WITNESS:  Oh, the cash flow.

24 BY MR. PAULSEN:

25     Q    Sir --

21

1          MR. PAULSEN:  Your Honor, I'd like to

2   mark this as Exhibit B, please.

3          THE COURT:  Okay.

4   BY MR. PAULSEN:

5      Q    Sir, before we get to Exhibit B, back on

6   Exhibit A, this is done on an accrual basis, correct?

7      A    Correct.

8      Q    Okay.  So we turn to Exhibit B.  Can you

9   identify this document, please.

10     A    Statement of cash flow, March 2018, TDE of

11  Illinois.

12     Q    And what does this document show?

13     A    This document shows that we started with a

14  net income of $164,578.11.  We had our inventory,

15  which is our parts inventory, not our total, which

16  was 141,000; accounts payable, which is 182; sales

17  tax; short-term loans; net cash by operating

18  activities; and our PNC loan payables that we made.

19     Q    And then it gives a report of the cash at

20  the -- the net cash increase for the period, correct?

21     A    Yes.

22     Q    And now this was 319,000, or so?

23     A    300 -- well, yes.

24     Q    All right.  Now, in here under the

25  short-term loans, line number 258 -- or one of the

1  258s -- short-term loans, loan payable to Forward

2  Financing for 300,000.

3      A    Yeah.

4      Q    What was that?

5      A    We had a financial institution contact us

6  about an SBA loan.  We were seeking to get out from

7  underneath the $20,000 a week payment to Transtar

8  because it was breaking our back we felt.  This

9  company contacted us.  We went through the process.

10  They said that they should have SBA loan approval

11  shortly.  They gave us $300,000 in advance of the SBA

12  note, which they said they would pay off once the SBA

13  note funded, and it never funded.

14      Q    What about the line above that, the loan to

15  Kabbage for 85,000?

16      A    Yes.  I believe that was taken because we

17  had to go buy more inventory, more transmission cores

18  to fill Transtar orders.

19      Q    So these are the short-term, high-interest

20  loans, correct?

21      A    Yes.

22      Q    All right.

23          MR. PAULSEN:  Your Honor, I have some

24  other financial statements for April, May, and June.

25  It might be more -- I'm trying to use our time as

1    efficiently as possible.

2                    THE COURT:  Sure.

3                    MR. PAULSEN:  I know it's almost time

4    for a break.

5                    THE COURT:  Right.

6                    MR. PAULSEN:  It might be helpful to

7    kind of separate those and hand them up as one group

8    exhibit.

9                    THE COURT:  Sure.  Not a problem.

10                    MR. PAULSEN:  So perhaps this would be

11    a good time for a break.  I can get the exhibits

12    assembled, and we can --

13                    THE COURT:  All right.

14                (Discussion between the Court

15                  and the courtroom deputy.)

16                    THE COURT:  Okay.  So why don't we

17    take a break.  We'll do the 9:30 call, which will

18    probably take ten minutes, tops.

19                    MR. PAULSEN:  Thank you.

20                    THE COURT:  Mr. Paulsen, if you want

21    to leave or whatever you want to do to get organized,

22    that's fine.

23                    MR. PAULSEN:  Thank you.

24                        (Brief recess.)

25                    THE COURT:  All right.  Are we ready

1   to proceed on the trial again?

2            MR. PAULSEN:  Yes, Your Honor.

3            THE COURT:  Okay.

4            THE CLERK:  Recalling line 1, TDE of

5   Illinois, Inc.

6            MR. PAULSEN:  Your Honor, may I

7   approach the witness?

8            THE COURT:  Yes, you may.

9            MR. PAULSEN:  Your Honor, what I've

10  done is I've assembled the financial reports for each

11  of the months of April, May, and June into one packet

12  of paper.

13           THE COURT:  Okay.

14           MR. PAULSEN:  I guess I'd refer to

15  these as Group Exhibit C.

16           THE COURT:  Sure.

17  BY MR. PAULSEN:

18      Q    Mr. --

19           THE COURT:  You did not ask for

20  Exhibit B to be admitted.  Did you want it admitted?

21           MR. PAULSEN:  Yes, Your Honor.

22           THE COURT:  Any objections from the

23  bank?

24           MR. WASSERMAN:  No, Your Honor.

25           THE COURT:  It will be admitted.  All

1   right.

2   BY MR. PAULSEN:

3       Q    Sir, will you take a look at the stack of

4   papers I just handed you?

5       A    Yes.

6       Q    Have you seen these documents before?

7       A    Yes.

8       Q    And these are the financial reports for

9   April, May, and June, similar to the ones we just

10  looked at with A and B, correct?

11      A    Yes.

12      Q    And these were generated by the QuickBooks

13  software as well, correct?

14      A    Correct.

15           MR. PAULSEN:  Your Honor, I'd move for

16  Group Exhibit C to be admitted.

17           THE COURT:  Any objections?

18           MR. WASSERMAN:  No, Your Honor.

19           THE COURT:  They will be admitted.

20  BY MR. PAULSEN:

21      Q    Now, sir, on each one of these statements,

22  if we look at the April profit and loss, what was the

23  net income for April?

24      A    Net income was $20,598.

25      Q    And on the statement of cash flows, what

1   was the net cash increase for the period?

2       A    Net cash increase for the period was

3   negative one ninety-three, seven hundred and fifty

4   thousand and forty-one cents.

5       Q    And then for May 2018, the net income was

6   negative 314,000?

7       A    Correct.

8       Q    And the statement -- on the statement of

9   cash flows, the net cash was negative 91,000,

10  correct?

11      A    Correct.

12      Q    And if we look on the statement of cash

13  flows from May 2018, there's a whole lot more

14  short-term capital loans, correct?

15      A    Correct.

16      Q    So is this the period that we were talking

17  about earlier when Transtar was reducing their

18  orders, ordering more expensive-to-produce product,

19  taking out the 20,000, and then not paying you?

20      A    Yes, that is correct.

21      Q    All right.  And then if we look at June,

22  for that period we had net income of $117,000,

23  correct?

24      A    That is correct.  $117,895.45.

25      Q    And then if we look at the cash --

1  statement of cash flows for June, we have a net

2  increase in cash of about $67,000, correct?

3      A    Correct.

4      Q    So things are getting better?

5      A    Yes.  That is the time period that I

6  started reaching out to everybody I knew in the

7  industry to sell our product to, trying to diversify

8  more.

9      Q    Okay.  Now, during this -- we'll get to

10  that in a second.

11           During this period, March through June

12  of 2018, were you doing anything else with the

13  business?

14      A    We had a company -- one of our customers

15  who is very big in the industry for manual

16  transmissions, and they supplied Chrysler with

17  remanufactured product, they buy their automatic

18  transmissions from us.  And they wanted to acquire us

19  and relocate the entire company to Oklahoma in the

20  future after our lease was up.

21           We entered into talks.  They looked at

22  our books.  And they were very excited about moving

23  forward.  They came to our location, spent two days

24  going over things, talking to our employees.  Went to

25  Cleveland, Ohio to visit Transtar to work out a

1   supply agreement.

2        Q    And when was this that they were visiting?

3        A    Had to be the second week of June, I

4   believe.

5        Q    Okay.  And have they -- have they bought

6   the company yet?

7        A    No.

8        Q    Why not?

9        A    From my understanding, what they told me,

10  they went to Transtar because they wanted Transtar to

11  finance the purchase of the company for a specific

12  price that we had agreed upon.  In turn, Transtar

13  would finance then the purchase, give them a supply

14  contract, and make them feel all nice and happy, and

15  then they would take a percentage of each sale as a

16  loan payment.

17       Q    Okay.  And that deal hasn't been worked

18  out?

19       A    No.

20       Q    Okay.  Do you know if they're still talking

21  to Transtar?

22       A    Yes.

23       Q    Are they still talking to you?

24       A    Yes.

25       Q    If they make you an official offer to buy

1  the company, would you consider selling it?

2      A    Yes.

3      Q    So we talked a little bit about how you had

4  some difficulties with Transtar, and you took on some

5  of these capital-advance loans, these short-term

6  loans, right?

7      A    Um-hum.

8      Q    What else have you -- and you talked a

9  little bit before about how you started to diversify.

10 Can you tell us a little bit about that?

11     A    We reached out to a company called Whatever

12 It Takes.  Their business logo is WIT.  They're

13 located in Louisville, Kentucky.  They are the number

14 two supplier in the automatic transmission industry.

15 They call us normally when they only have a problem

16 with one of their products.  They buy ours.  It

17 works.  They're happy.

18              We've been trying to get them to buy

19 more product from us than what they have been in the

20 past.  And we've seen a slight uptake in sales.

21 They're calling more, requesting quotes.  And I have

22 a meeting with them tomorrow to work out some more

23 details, hopefully.

24     Q    Okay.  So that one's still in progress?

25     A    Yes.

30

1    Q    I understand you had a meeting with a

2  potential customer on Monday.

3    A    Yes.  That's ETE of Milwaukee, Wisconsin.

4  They are a huge transmission remanufacturer.  To give

5  you an idea, they produce 320 transmissions a day.

6  We produce about 250 a month.

7    Q    Okay.

8    A    Okay.  They are wanting us to supply them

9  with remanufactured transmissions built to their

10  specifications because they can't produce enough.

11  And we have the excess capacity right now.

12    Q    Okay.  Have they placed an order with you?

13    A    Sam Loshak, the president and CEO of the

14  company, gave me a verbal order for transmissions.

15  He told me to gear up for them.  We've recalled our

16  employees that were laid off.  They're going to be

17  restarting on Monday.  We have been comparing notes

18  on product pricing to see who can get the best deal

19  on parts.  And they should be issuing a purchase

20  order after I call them today.

21    Q    Now, you don't have a purchase order yet,

22  right?

23    A    No.  We are still -- they have not decided

24  whether they want me to supply the parts, or if they

25  want to supply the parts.  They're trying to figure

1   out which is more cost effective.

2         Q    Now, in your industry, is it unusual not to

3   have a purchase order before you start working on a

4   job?

5         A    Oh, God, no.  No.

6         Q    How does the ordering process usually work?

7         A    A lot of times in our industry, such as

8   with Transtar, we would get a phone call or an

9   e-mail.  After we quoted the unit, we would supply

10  our part number that we recognize for it.  And then

11  we go, oh, we don't have that in the system; we have

12  to create our part number to associate with it; go

13  ahead and start building it; and you'll get the

14  purchase order as soon as possible.

15                   And that could take one to two days.

16  It could take a couple of hours.  They were very

17  inconsistent about that.  But, I mean, we operate on

18  a person's word.

19        Q    All right.  You've already started working

20  on this particular order, correct?

21        A    Yes.

22        Q    And what is the order for again?

23        A    To be specific, it's for 20 GM 4L80E truck

24  transmissions, and it is for 20 Ford 4R70W

25  transmissions, which are used in Crown Victoria's to

1   common line E350 vans.

2     Q    And what is the expected gross revenue from

3   those orders?

4     A    Well, if we do it all in-house, the gross

5   revenue should be roughly about $40,000.

6     Q    But then you'd have to purchase the parts

7   too, correct?

8     A    Correct.

9     Q    If they purchase the parts, what do you

10   expect the revenue to be?

11     A    If they purchase the parts at 40 units, it

12   would be roughly 19 -- about $19,000 in labor.

13     Q    But your cost of goods sold would be much,

14   much less, correct?

15     A    It would be zero.

16     Q    All right.  Do they also talk about

17   purchasing inventory from you?

18     A    Yes.  They are -- well, it's two things

19   that they want to do.  ETE is very much interested in

20   acquiring us as well.  They want to help us

21   straighten out the company to make us profitable

22   again because they want me as part of their company.

23   They are offering to purchase a lot of our excess

24   inventory that we have in our facility at current

25   market price to help us raise cash to operate on.

33

1   And this is something that we've done in the past as

2   well.  It's nothing new.

3       Q    So you often get -- you often sell

4   inventory out of your -- or items out of your

5   inventory, correct?

6       A    Oh, yes, all the time.  Because if we lost

7   a product line for a specific transmission

8   application, there's no reason to keep a hundred of

9   those transmissions in our inventory just gathering

10  dust.  So we would call one of our suppliers and say,

11  hey, we have this to offer; what's the current market

12  value?  He would say 200, 500, whatever the price

13  was, and we'd offer them for sale.

14      Q    When do you expect to deliver on ETE's

15  order?

16      A    It would take us, to produce those units,

17  one week.

18      Q    Okay.  And when will they pay you?

19               MR. WASSERMAN:  Objection.

20  Speculation.

21               THE WITNESS:  No, it's not

22  speculation.

23               THE COURT:  Mr. Anthony, I get to

24  rule.

25               THE WITNESS:  Oh, sorry.  I apologize.

34

1          THE COURT:  I am going to overrule it.

2          You can go ahead.

3  BY MR. PAULSEN:

4      Q    When would they pay you, sir?

5      A    The -- Sam Loshak, again, on the core

6  purchases, the moment the cores are in his building,

7  he sends a check, okay, or does an ACH payment,

8  whatever I want.  On the transmissions, the moment

9  they're in his facility he verifies they are there,

10  he pays us.

11      Q    Now, the core units are the one you

12  remanufacture?

13      A    Yeah, the core units -- everything in our

14  facility is either finished goods, done, ready for

15  sale, or core, waiting to be built for sale.

16      Q    Okay.  So the core is when he's buying out

17  of the inventory?

18      A    Correct.

19      Q    So if you deliver in a week, you would

20  expect payment in a week?

21      A    The next day.

22      Q    You mentioned that he was interested -- the

23  ETE company was interested in purchasing the

24  business.  Can you tell us more about that?

25      A    Well, as with both companies, Blumenthal

1  Manufacturing, as well as ETE, they are interested in

2  buying the companies because they want myself and my

3  general manager.

4           I've been in this industry for 46

5  years.  I am a master mechanic.  I'm an engineer.  I

6  used to design internal sealing systems for automatic

7  transmissions for car companies.  GM, Ford, Chrysler,

8  Honda, and so forth were my company's clients that I

9  work for.  I hold patents on parts.  I've written

10 thousands of technical bulletins.  I'm the guy that

11 people come to when there's a problem to fix.

12          They want me to run their operation

13 and help fine-tune it and make the product better for

14 them.  Everybody loves our product, okay?  No one has

15 anything bad to say about it.  And they want my

16 product because of my reputation and who I am.

17     Q    Along those lines, you mentioned ITW

18 earlier.

19     A    Yes.  Idaho Transmission Warehouse.

20     Q    Can you tell us a little bit more about

21 their order?

22     A    They placed their first order last night

23 for a Dodge truck transmission, which is in process

24 of being built right now to ship today to them.  They

25 have their own transmission facility as well called

1   Western Transmission.  That's their transmission

2   shop.  Plus, they sell parts and remanufacture

3   transmissions to local transmission shops in the

4   upper Northwest.

5       Q    Okay.  Have you had any other interests

6   from other potential customers?

7       A    We've had quite a bit of new orders come in

8   from a company called Quality Transmissions located

9   down in Missouri.  We've had interest from a company

10  called Capital Transmissions in Ohio that is looking

11  to handle a reman program.  We've had interest from a

12  company called Portland Transmission Warehouse,

13  Portland, Oregon.  He's interested in a reman

14  program.  He's trying to figure out warehouse space.

15  And we've had significant calls from other companies

16  now, especially AAMCO and Mr. Transmissions.

17                  MR. PAULSEN:  Okay.

18                  One moment, Your Honor.

19                      (Brief pause.)

20                  THE COURT:  Yes.

21  BY MR. PAULSEN:

22      Q    Sir, earlier we were talking about the

23  party in Oklahoma that was interested in purchasing.

24      A    Um-hum.

25      Q    When did you really start to begin talks

37

1  with them?

2      A    February of this year, we -- my wife and

3  myself -- my wife is technically the CEO of the

4  company.  We went out there for three days to spend

5  time touring their facility and talking to them.  We

6  talked about strategy.  We talked about money and

7  moving forward together.

8      Q    So that's about the same time that you

9  started to take out these high-interest loans?

10     A    Correct.  We -- at that time, again, orders

11 were changing with Transtar.  We kept on broadening

12 our offering.  You got to understand, when we started

13 with Transtar, we offered them ten line items, which

14 is ten different transmissions.  Now we are prime on

15 over a hundred different part numbers.  That's how

16 much we've grown with them, and it's cost us a

17 fortune to keep growing.

18     Q    So does that broaden the number of other

19 people that you can go to now to replace Transtar?

20     A    Tremendously.

21     Q    And have you been -- what other sorts of

22 things have you been doing to diversify your customer

23 base?

24     A    Well, we started an advertising flyer

25 program to go back after more warranty insurance

1    companies.  When we started, we were very big with a

2    company called Aon Ryan, which serviced CarMax

3    nationwide.

4                Through that we grew into selling to

5    individual dealers, such as Land Rover, Scottsdale of

6    Arizona, that's owned by Roger Penske Auto Group, who

7    is the largest privately owned high-end dealer

8    network in the United States.  And we sell to a lot

9    of his dealers privately.

10                We sell to a lot of different warranty

11   companies, and we are going back after that business

12   again, because when Transtar was so big with us, we

13   could not handle the warranty companies at the same

14   time.  We lost the warranty group Aon Ryan because of

15   Transtar, because the customer doesn't like being

16   told no, I don't have the transmission that you need

17   to fill the order.  So we lost them because Transtar

18   was draining us dry of everything that we could

19   build.

20        Q    And how long -- you have been working with

21   Aon Ryan for a long time, correct?

22        A    Fourteen years.  They were a

23   $2 million-a-year client that we lost because of

24   Transtar.

25        Q    And have you been in touch with them

1  since -- in the last couple of months?

2      A    We've reached out to them.  They're

3  interested in talking to us because of our

4  long-standing prior relationship.  They just need

5  assurances that we won't say no to them again.

6      Q    Understood.

7            MR. PAULSEN:  Your Honor, may I

8  approach?

9            THE COURT:  You may.

10            MR. PAULSEN:  Your Honor, I'd like

11  to -- this is the budget that I handed up earlier.

12            THE COURT:  Yes.

13            MR. PAULSEN:  Although it says Exhibit

14  A at the top, for the purposes of this hearing, I'd

15  like to refer to it as Exhibit D.

16            THE COURT:  Yes.

17  BY MR. PAULSEN:

18      Q    Sir, I've just handed you what's been

19  marked as Exhibit D, but it also says Exhibit A at

20  the top.

21      A    Yes.

22      Q    Have you seen this document before?

23      A    Yes.

24      Q    What is this document?

25      A    This is our proposed budget from 7/16 to

40

1   7/31 of July 2018.

2        Q    And this is the budget for use of cash

3   collateral, correct?

4        A    Correct.

5        Q    This has been revised from what we filed

6   before, correct?

7        A    Yes.

8        Q    And does this budget accurately reflect

9   your projected income and expenses over the next two

10  weeks?

11       A    Yes.

12            MR. PAULSEN:  Your Honor, I have no

13  further questions -- well, actually, one second,

14  please.

15            THE COURT:  Sure.

16                (Brief pause.)

17            MR. PAULSEN:  All right.  Your Honor,

18  just one more follow-up point.

19  BY MR. PAULSEN:

20       Q    ETE, sir.

21       A    Yes.

22       Q    Do you expect them to increase their orders

23  in the future?

24       A    Yes.  The initial order is for 40 pieces.

25  They have been down in our facility twice.  We've

1  been up to their facility once.  They keep on asking

2  can we produce more than 65 units a week for them?

3  And as I explained to them, I say, my people have no

4  problems working Saturdays, they have no problems

5  working late, and if I need to, I'll find more

6  people.

7      Q    Have they -- have they made -- made any

8  indications that they intend to order more from you

9  in the future?

10     A    Oh, yes.  They're sending down their

11  projected list because currently they are 1,000-plus

12  transmissions behind on their orders for their

13  clients.  So what they want to do is use us to start

14  gaining ground.  That's phase one.

15                After we get them caught up, and we

16  help them maintain, they want to go into phase two

17  because they like the fact that we're a specialty

18  company, that our primary focus was inputs, okay?

19  And they want to start broadening their offerings

20  into the input market because they currently don't

21  offer Mercedes, or Audi, or BMW.  That's not their

22  thing.  Their thing is domestic transmissions.  So

23  that's why they're really interested in us.

24                MR. PAULSEN:  Just one more thing,

25  Your Honor.  I'd like to move to admit Exhibit D.

42

1          THE COURT:  Okay.  Any objections?

2          MR. WASSERMAN:  No.

3          THE COURT:  It will be admitted.

4          MR. PAULSEN:  Now I believe I don't

5  have any more questions at this point.

6          THE COURT:  Okay.  Thank you.

7          Mr. Anthony, just stay there.  We have

8  one matter on the 10:00 o'clock call.

9               (Brief recess.)

10         THE COURT:  Okay.  I think we're now

11 ready to resume the trial.

12         THE CLERK:  Recalling TDE of Illinois,

13 Inc.

14         THE COURT:  And, Mr. Paulsen, you

15 completed your questions of Mr. Anthony?

16         MR. PAULSEN:  Yes.

17         THE COURT:  All right.

18         Then PNC Bank is up next.

19         MR. WASSERMAN:  Yes, Your Honor.

20         THE COURT:  Okay.

21              CROSS-EXAMINATION

22 BY MR. WASSERMAN:

23     Q    Good morning.

24     A    Good morning.

25     Q    Mr. Anthony, you mentioned at the beginning

43

1    that you are the president of the company.  Who are

2    the other officers?

3         A    My wife, Melanie K. Anthony.

4         Q    And are you an owner of the company?

5         A    Yes, I am.

6         Q    Are there other owners?

7         A    My wife.

8         Q    What percentage do you own?  What

9    percentage does your wife own?

10        A    She is -- I -- she is 40 -- excuse me.  I'm

11   49 percent.  She's 51 percent.

12        Q    Mr. Anthony, does TDE of Illinois have

13   employees?

14        A    Yes.

15        Q    How many employees does it currently have?

16        A    Eleven.

17        Q    And you mentioned in your testimony that

18   you were bringing back some employees?

19        A    Correct.

20        Q    How many are you planning on bringing back?

21        A    Five.

22             Six.  Sorry, six.

23        Q    Six.

24             Starting with the 11, does that

25   include you and your wife?

1      A    Yes.

2      Q    And are you paid a salary?

3      A    Yes.

4      Q    Is your wife paid a salary?

5      A    Yes.

6      Q    And how much are those salaries?

7      A    I am 120,000 a year.  She is 49,000 a year.

8      Q    And speaking of those 11 employees, how

9  often are they paid?

10      A    Bi-weekly.

11      Q    Every other Friday, every --

12      A    Every other Friday.

13      Q    And do you know the -- the amount of

14  payroll that comes out for those 11 employees every

15  other week?

16      A    No, I don't.

17      Q    When did TDE of Illinois get down to 11

18  employees?

19      A    End of June.

20      Q    And at the beginning of June, how many

21  employees did you have?

22      A    Twenty-two.

23      Q    So was approximately payroll cut in half?

24      A    Yes.

25      Q    So if I could ask you to take a look at the

45

1    June profit-and-loss statement, which I believe was

2    part of Group Exhibit C.  It's line item 691 that I'm

3    taking a look at, which is about 75 percent down the

4    page.

5         A    Um-hum.

6         Q    Is that 85 -- first, in June of 2018, did

7    you make all wage payments?

8         A    Yes.

9         Q    Okay.  And that eighty-five thousand, four

10   sixty-six was the amount to pay all 22 employees?

11        A    Everybody, correct.

12        Q    Okay.  So the amount to pay monthly, the 11

13   employees currently, would be about half of that

14   approximately?

15        A    Correct.  Well, approximately.

16        Q    And so one payroll approximately would be a

17   little over $20,000?

18        A    Yes.

19        Q    Taking you also to, I guess, the top of

20   that June profit-and-loss statement, you report a

21   total income of $355,536.72.

22             How much of that was Transtar?

23        A    Probably in the vicinity -- off the top of

24   my head, going by previous sales to them, probably

25   somewhere between 200 to 220,000.

46

1      Q    You mentioned an audit with Transtar.  How

2  much is still -- how much is claimed still owing from

3  TDE to Transtar?

4      A    Should be as of Friday, $42,000.

5              THE COURT:  I'm sorry, who owes who?

6              THE WITNESS:  We owe Transtar per

7  their numbers 42,000.

8              THE COURT:  Okay.

9              THE WITNESS:  See, our big goal was

10 also to try and get to June, okay?  Because if we

11 made it to June, we would have paid off Transtar a

12 hundred percent, and we would have been starting to

13 pay people back rapidly.  We had multiple things

14 going on.  The sale of the company, trying to get to

15 June.  We were scrambling to do anything and

16 everything we could to get to that point.

17 BY MR. WASSERMAN:

18     Q    Mr. Anthony, did you --

19     A    I meant August.  I apologize, August.  We

20 were trying to get to August.

21     Q    Understood.

22              Did you assist in preparing the

23 schedules and pleadings and papers that were filed

24 with the bankruptcy court?

25     A    No.  I've reviewed -- I reviewed them.  I

1  gave them all the information that was requested,

2  along with my wife.

3      Q    Did you believe that they're accurate?

4      A    Yes.

5      Q    Can you explain why on your list of 20

6  largest unsecured creditors, Transtar is listed with

7  an account -- with a claim of $180,000?

8      A    That might have been what it was at that

9  time.  But, see, even though we're not doing business

10 with them, they still owe us money.  They're still

11 taking their weekly payment against that.

12     Q    Do you believe in the last ten days

13 Transtar has taken 140,000?

14     A    They would have taken their payment -- we

15 buy parts from Transtar, okay?  Transtar would have

16 taken their monthly parts payment because they always

17 wanted to be paid in full.  So if we bought product

18 in June, July 1st they took that payment.  They

19 didn't give us 30 days like we had to give them,

20 okay?  Plus, on top of that, they would take their

21 $20,000-a-week payment.

22     Q    So have you purchased inventory from

23 Transtar in the last couple weeks?

24     A    No.  As little as possible.  I don't want

25 to do business with them.

48

1      Q     That's two different answers.

2      A     Well --

3      Q     Why don't you clarify.

4      A     -- we've -- okay.  My parts manager is

5   under orders not to buy from them unless absolutely

6   necessary.  I have not seen a Transtar delivery in

7   the last two, three weeks personally.

8      Q     Have you bought from other suppliers in the

9   last week?

10     A     Yes.

11     Q     And who have you -- who have you been

12  purchasing from?

13     A     We've purchased from Wickstrom Chevrolet.

14  We've purchased from Friendly Ford, Patrick BMW.

15  We've purchased from WIT.

16     Q     And how much purchase -- do you know how

17  much you purchased?

18     A     No, I have no idea.

19     Q     Have you paid any of these people?

20     A     Yes.  We are on COD with them because I

21  don't want to get any further in debt.  We're paying

22  them as they deliver.

23     Q     And this has continued for the last week or

24  so?

25     A     Yes.

1    Q    Do you know how much you've paid out in the

2  last week?

3    A    No, I do not.

4    Q    Did you pay payroll last Friday?

5    A    Payroll is due this Friday.

6    Q    Payroll is this Friday.

7         If I could ask you to take a look at,

8  I believe it's Exhibit D, even though it says Exhibit

9  A on top, which is the budget.

10         You expect this to be the budgeted

11  items for the next two weeks?

12    A    We feel we can do that with our current

13  sales that we're getting.  And it depends really on

14  what ETE does.

15    Q    So it's a little bit speculative upon what

16  ETE does?

17    A    Yes.  We don't know.  We just sent them --

18  as I stated before, we just sent them yesterday the

19  information of what our cost is to purchase parts for

20  their program so they can compare it to what they're

21  currently paying.

22    Q    So if you do not get the E -- it's E-T --

23    A    ETE.

24    Q    ETE, sorry.  There's a lot of letters --

25    A    Yeah, I know.

50

1     Q     -- in this case.

2           You will not hit that 95,000 gross

3  income?

4     A     We're going to get it.  I've already been

5  assured that by the president of the company.  We

6  just don't know how we're going to do it yet.  He's

7  got to look at if he supplies the parts, what does it

8  cost him to ship the product out.  He's got to look

9  at what I can do because I've already got the product

10 there in my facility.  And that's what we're waiting

11 to hear back today on.

12    Q     So you don't know the type of work exactly

13 you're getting?

14    A     We know what we're going to be building.

15 We've been given two product orders, two transmission

16 types that he wants now.

17    Q     Is any of that $95,000 gross income from

18 Transtar?

19    A     None.

20    Q     If you look about a third of the way

21 through this budget, it says payroll, and that's left

22 blank.  Can you explain why?

23    A     It's got payroll tax-exempt.  Where is

24 payroll?  Expenses.  I have no idea why she left it

25 blank.

1     Q     And you would expect payroll to be about

2     $20,000?

3     A     Yes.

4     Q     So if you take that $20,000 from the

5     proposed net income of 14,000 you have a negative

6     number?

7     A     Well, yes.  Doing the math, yes.  But I

8     don't know why it's done that way.  And it would --

9                MR. PAULSEN:  Do you mind?

10                MR. WASSERMAN:  Yes, I do mind a

11     little bit.

12                MR. PAULSEN:  Okay.

13                MR. WASSERMAN:  You know what,

14     actually, if counsel wants to --

15                THE COURT:  It sounds to me like

16     there's something that needs to be explained here.

17     If you --

18                MR. WASSERMAN:  I think that makes a

19     lot of sense.

20                THE COURT:  Otherwise, you're going to

21     get confusing answers, and then you'll get the

22     explanation.

23                So, Mr. Paulsen, can you help us here?

24                MR. PAULSEN:  Yes, Your Honor.

25                There's was -- I made a mistake on the

52

1  budget.  I didn't put in a number that should have

2  been in there.

3               THE COURT:  Okay.

4               MR. PAULSEN:  I'm trying to get the

5  number from the office right now.  My suggestion

6  would be that we just take a break for a few minutes

7  while we get that.

8               THE COURT:  I think that makes perfect

9  sense.  Okay.

10              MR. PAULSEN:  Thank you.

11              THE COURT:  Thank you.  Let me know

12 when you're ready.

13                    (Brief recess.)

14              THE CLERK:  Recalling TDE of Illinois,

15 Inc.

16              THE COURT:  Okay.  Mr. Anthony, you

17 may sit.

18              Mr. Paulsen.

19              MR. PAULSEN:  Sure.  Your Honor, we've

20 had an opportunity to look at the budget a little

21 bit, and also have a conversation with Mr. Wasserman

22 and Ms. Gleason, and they raised a number of

23 concerns.  Given what we've learned so far.  I'm sure

24 they'll tell you all about them.  But I think the

25 proposal is -- or at least what we'd like to do is to

53

1 get a short budget, maybe just the most important

2 things that we have to pay, like payroll for the next

3 week or so, and then come back again in front of you,

4 maybe agree maybe to pick up kind of where we left

5 off.

6            In order to do that, however, I think

7 we're in agreement that we'd like Mr. Anthony excused

8 as a witness so we can all sit down at the table and

9 go through the budget.  And then if we need to pick

10 back up and do more hearing, then we can call him

11 back as a witness.

12            THE COURT:  Okay.

13            MS. GLEASON:  That's correct, Your

14 Honor.  A number of questions that we realized we

15 really would like to, you know, ask Mr. Anthony, but

16 did not want to do that during the -- the time period

17 when you were not in the courtroom.

18            Also, Your Honor, I think -- and I

19 just -- I'm not sure if Your Honor has the same view

20 as both Mr. Wasserman and I.  I think we've gotten

21 past our concern as to how we got here.  You know, we

22 understand that a little bit more.  But now, is it

23 really turning around how we're going to go forward

24 in it.

25            In particular, the concern I have is

1  asking employees to work in this time period, and are

2  they going to get paid?  And that I still don't

3  understand from this budget, and that's why we need

4  some more information --

5                    THE COURT:  Okay.

6                    MS. GLEASON:  -- before I think we can

7  go forward.  Mr. Paulsen indicated that he just

8  doesn't have it at this point.

9                    The payroll, from what we've been

10 told, is really just from, I think, the 9th through

11 the 13th.  So there's been employees that have been

12 working, and that's not covered in anything.  And

13 then going forward, in addition when what is said as

14 the income coming in is really not very much, and

15 we're not sure if that is actually going to come in

16 during this time period.  Also, do not know what the

17 cash on hand is.

18                    THE COURT:  Mr. Wasserman.

19                    MR. WASSERMAN:  I'm going to largely

20 echo what the two of them said.  I think there's some

21 significant concern that even if -- it's a razor-thin

22 budget.  And even if there was -- while it didn't get

23 worse for the creditor body, we're also looking

24 for -- to having to pay rent in August, having to --

25 you know, by a margin of what's to be paid.  There's

1  employees who are having to work.  And are we in the

2  situation that, you know, maybe in the next seven

3  days we're not going to get worse, but it's going to

4  be much worse once we have to start paying all of the

5  operating expenses.

6            So I think we're going to sit down,

7  see if we can come up with a razor-thin budget for

8  the next week, and then figure out if it makes sense

9  to keep this operation past that week.

10            THE COURT:  Yeah.  I will say, on

11  Monday I had grave concerns about the company, and I

12  wasn't getting any answers.  I think that Mr. Anthony

13  and Mr. Paulsen, you've done an excellent job here of

14  answering most of the questions that we had.  Now

15  we're getting into the true operations.

16            And one of the concerns I had on

17  Monday is with Mr. Anthony not here, I was very

18  concerned who's running this company, and what he's

19  doing.  Mr. Anthony is a very, very competent

20  individual, and has created a lot of confidence that

21  I didn't have on Monday, now that he's here and I've

22  heard him testify.

23            So, if you can sit down and work

24  through these things, I think that's excellent.  And

25  it's a great idea.  And I will approve some sort of

1  an interim budget so that you can take the time to do

2  that.

3            Mr. Paulsen, you've been in the case

4  all of, what, two or three days.  And, you know, I do

5  think we need to figure out how to keep the doors

6  open and keep the employees there and try to get this

7  work in in the interim until we figure out the

8  nitty-gritty of whether or not we can really go

9  forward.  So I'm completely in agreement with that

10 proposition.

11           I think what you're saying is you want

12 to sit down now.  And if you can't agree on how to

13 get from here to maybe next week, we may have to come

14 back here and have a further discussion and have Mr.

15 Anthony go back on the stand.  That's fine.  We turn

16 into pumpkins at 3:00 o'clock today, and I think you

17 guys know why, probably.

18           So between now and 3:00 o'clock, I'm

19 here.  I may run out and do an errand or two, but I'm

20 at your disposal.  I can either say come back when

21 you're ready to talk, or we can say why don't you

22 come back at 1:00 o'clock today to see where we're

23 at.

24           MR. WASSERMAN:  Can I make a

25 recommendation, if you don't mind?

1           THE COURT:  Sure.

2           MR. WASSERMAN:  I think we're all

3    here.  We were hoping -- I think we're interested in

4    your courtroom, if that's okay.

5           THE COURT:  Absolutely.  And now

6    you're in the air-conditioning.

7           MS. GLEASON:  Yeah, it's certainly

8    cooler than my office.

9           MR. WASSERMAN:  And see if in the next

10   half hour, 45 minutes --

11           THE COURT:  Sure.

12           MR. WASSERMAN:  -- working out an

13   order, and maybe try to grab you before lunch, if

14   that's possible.

15           THE COURT:  Okay.  I will just stay in

16   my office until I hear from you.  And like I said, I

17   do have one errand I'd like to run, but I'm not going

18   to do that now.  I'll wait.  Because as long I'm done

19   by 3:00 o'clock, I'm good.

20           MR. WASSERMAN:  And I guess one other

21   question, Your Honor, is your -- this court's

22   availability.  Next week we set out X dates and --

23           THE COURT:  Right.  Next week I'm here

24   on Monday morning, the 23rd, and I'm here all day on

25   the 24th.  The 25th, the 26th, and the 27th I am

58

1   not available.  So that's the problem.  Then we would

2   have to come back.  I am actually in the office on

3   the 30th also.  It's not a date I normally hear

4   court, but if I have to, I can hear something.

5               So in terms of thinking about what

6   you're doing, it would be the morning of the 23rd, or

7   any time on the 24th, although we do have other

8   matters on the 24th, to come back for another

9   hearing.

10              MR. PAULSEN:  Hopefully this won't be

11  needed, but if we had to have additional testimony on

12  the 24th, would there be time for that or is there

13  another trial?

14              THE LAW CLERK:  The only other matter

15  that might conflict is the McMahan.  There's a status

16  on the CRO.

17              THE COURT:  Yeah, I think they're

18  going to work that out, so I think we're probably

19  okay.

20              MR. PAULSEN:  Okay.  Thank you.

21              THE COURT:  Okay.

22              MR. BRITT:  Thank you.

23              THE COURT:  Thank you.  Let me know.

24              (Brief recess.)

25              THE CLERK:  Recalling TDE of Illinois,

1  Inc.

2              MR. PAULSEN:  Your Honor, we have an

3  agreement on how to proceed.  Along the same lines

4  that we were discussing earlier, we sat down, and we

5  worked out kind of a bare-bones budget for the next

6  week.  So we have an agreement on terms in the order

7  and agreement on the budget.  So I think what we need

8  to do is go back and type it up and submit it.

9              THE COURT:  Great.  Perfect.  And when

10 are you going to come back?

11             MR. PAULSEN:  We'd like to come back

12 on the 24th, Your Honor.

13             THE COURT:  Sure.  That's fine.

14             MS. GLEASON:  And, Your Honor, just to

15 let you know that I will not be in the office that

16 day, but I'll have someone up to speed in my office

17 covering it.

18             THE COURT:  Okay.  Good.

19             Let's set it for 10:30 on the 24th.

20 Hopefully you won't need time for testimony, but if

21 you do --

22             MR. BRITT:  Yeah.

23             THE COURT:  -- I'll be available.

24             MR. BRITT:  And I believe if we -- if

25 we have worked some things out, that we might not

1   need testimony.

2                    MR. WASSERMAN:  The debtor is going to

3   get us, the U.S. Trustee and PNC, some AR aging

4   information, and so forth, so we can have a better

5   understanding of cash flow, expected cash flow in the

6   next few weeks.  And I guess we'll see where we are,

7   but we're hoping.

8                    THE COURT:  Okay.  You know, I truly

9   appreciate the fact that everybody's working

10  cooperatively here.  I think everyone is better off

11  at the end of the day if we can, you know, keep a

12  business that's -- that works, working and creating

13  money.  So hopefully this will all work out.  I

14  appreciate you cooperating with each other, and I

15  would just say just communicate.

16                   If there is a problem, make sure

17  Mr. Anthony is here.  He's the difference between

18  success and failure here, clearly.  And, so -- but I

19  will leave that up to you.  Again, I will have time

20  available on the 24th, if we need to have testimony.

21  Hopefully you can continue to work cooperatively and

22  not need it.

23                   MR. WASSERMAN:  And if we don't, I

24  think we'll try to maybe call your office and so

25  forth so you can --

61

1                    THE COURT:  Yeah, that's fine.  Just

2    give us a heads up.

3                    We're in Geneva tomorrow.  And we have

4    this party starting at 3:00 today, so if you can get

5    the cash collateral order --

6                    Anthony's retiring.  So we're having

7    an open house for him here, prior to the bench/bar

8    party, which is later in the day.  So now you know.

9                    MR. ANTHONY:  I wish I was.

10                    THE COURT:  No, not Mr. Anthony, my

11    courtroom deputy, Anthony Watson, who has been here

12    32 years, and we're having this party starting at

13    3:00 today.  So if you can get this all into us

14    before then, we'll get it entered.  If you can't,

15    it's going to be a little bit more complicated, and

16    you have payroll to make tomorrow.

17                    MR. PAULSEN:  We will do it by

18    3:00 o'clock.

19                    THE COURT:  Okay.  If there's a

20    problem, just call us.  You know, we'll make -- we'll

21    have our cell phones with us, and we'll make sure

22    we're watching the phones and that sort of thing.

23                    MR. WASSERMAN:  We went through the

24    order and we went through the budget.

25                    MS. GLEASON:  So, there's an agreement

1    --

2                MR. WASSERMAN:  I think --

3                MS. GLEASON:  -- I think that payment

4    can be made regardless if Your Honor --

5                THE COURT:  Okay.

6                MR. WASSERMAN:  We'll do our best to

7    get you guys to your party.

8                THE COURT:  Okay.  Good.  Good.

9                And you now know the new e-mail

10   address to send in orders.  We have a new box for

11   draft orders now.  With Anthony's retirement, it made

12   sense to not send things to him anymore, so we

13   created this.  So this is now our draft order box.

14   And when that comes in, my law clerks, as well as my

15   deputy all get it.  So we will be looking for it.

16               MR. PAULSEN:  Okay.

17               THE COURT:  All right.

18               MR. PAULSEN:  Thank you.

19               MR. ANTHONY:  Thank you so much, Your

20   Honor.

21               (Which were all the proceedings had in

22               the above-entitled cause, July 19,

23               2018, 9:00 a.m.)

24   I, JERRI ESTELLE, CSR, RPR, DO HEREBY CERTIFY
     THAT THE FOREGOING IS A TRUE AND ACCURATE
25   TRANSCRIPT OF PROCEEDINGS HAD IN THE ABOVE-
     ENTITLED CAUSE.   /S/